UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 15-cr-216 (2) (DWF/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Alfredo Gil-Garcia (2), | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge upon Defendant Alfredo Gil-Garcia's ("Defendant") Motion to Suppress Statements, [Docket No. 49]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on November 19, 2015, regarding Defendant's pretrial motions.[1] The parties declined the opportunity to submit supplemental briefing regarding Defendant's Motion to Suppress Statements, [Docket No. 49], and the Court took Defendant's Motion to Suppress Statements, [Docket No. 49], under advisement on November 19, 2015.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 49], be **GRANTED.**

I.  **BACKGROUND AND STATEMENT OF FACTS**

A.  **Background**

On July 21, 2015, Defendant was indicted on one charge of sexual abuse, in violation of 18 U.S.C. §§ 2, 1151, 1152, 1153(a), 2242(2)(B) and 2246(2)(A). (Indictment [Docket No. 1]).

---

[1]The Court addressed Defendant's pretrial discovery motions by separate order, [Docket No. 58].

B.  Facts[2]

Federal Bureau of Investigation ("FBI") Special Agent Jonathan Tjernagel ("SA Tjernagel") met with Defendant two times before the date on which Defendant was indicted with the charges against him.

On the first occasion, SA Tjernagel met with Defendant to obtain his consent to collect a DNA sample from Defendant. Defendant, who is from Cuba, speaks Spanish. SA Tjernagel, who does not speak Spanish, spoke to Defendant in English during that meeting. SA Tjernagel had difficulty understanding Defendant during the meeting.

On the second occasion, SA Tjernagel went to Defendant's residence on the Red Lake Reservation to speak with him regarding the events that form the basis for the Indictment. SA Tjernagel again spoke to Defendant in English during that encounter. To SA Tjernagel, it appeared that Defendant and SA Tjernagel were able to understand each other, but with difficulty.

Sometime between one to two months after July 21, 2015, the date on which Defendant was indicted, law enforcement officers executed an arrest warrant for Defendant that was issued pursuant to the Indictment.

On September 22, 2015, SA Tjernagel sought to interview Defendant at the United States Marshals' office in Saint Paul, Minnesota, where Defendant was being held in custody. SA Tjernagel decided to have the interview conducted in Spanish because Defendant was more comfortable speaking Spanish than English. SA Tjernagel asked FBI Special Agent Jonathan Holden ("SA Holden"), who is trained in speaking and understanding Spanish, to assist with the interview.

---

[2] The Court's statement of facts is derived from the testimony of Federal Bureau of Investigation Special Agent Jonathan E. Holden and Federal Bureau of Investigation Special Agent Jonathan Tjernagel at the November 19, 2015, motions hearing, as well as, the exhibits admitted into evidence at that hearing.

SA Tjernagel and SA Holden interviewed Defendant in a room at the U.S. Marshals' office. A Deputy Marshal brought Defendant from his cell to the interview room, where SA Holden and SA Tjernagel were waiting. Once Defendant entered the room, the Agents shut the door and began recording the interview. The Agents displayed their FBI credentials to Defendant and identified themselves as FBI Agents. The Agents were unarmed. SA Holden was dressed in a suit. SA Tjernagel was dressed in casual attire.

SA Holden did most of the speaking to Defendant during the interview. When SA Holden began speaking with Defendant, SA Holden noticed that Defendant appeared to be speaking in a dialect of Spanish that SA Holden associated with Cubans who lacked much formal education. As a result, it initially took SA Holden several minutes to get accustomed to Defendant's accent and the dialect of Spanish Defendant was speaking. However, after a period, SA Holden was able to understand Defendant such that he was able to converse with Defendant. It appeared to SA Holden that Defendant was able to understand SA Holden as well.

Only about four minutes into the interview, the following exchange[3] occurred:

SA Holden:   Okay, you know why we are here?

Defendant:   Hmm, why?

SA Holden:   You tell me.  Do you know or not?

Defendant:   Hmm?

SA Holden:   You know the reason we are here?

Defendant:   I think so, that the reason is for the story of the, the girl there, right?

SA Holden:   What is her name?

---

[3] This translation was offered into evidence at the hearing by the Defendant, (Def. Ex. A), without objection by the Government. SA Holden and Defendant spoke to each other in Spanish. At some points, the Agents spoke to each other in English. As the Court has set forth the translated description of the Spanish spoken during interview in English, the Agents' statements in English have been italicized to designate that they were originally spoken in English.

3

Defendant: I don't remember her, her name.

SA Holden: Okay. But, that's the reason are here? [sic]

Defendant: Hmm?

SA Holden: Because of what happened to her. Because, about, what happened to her.

Defendant: What happened to her?

SA Holden: You tell me. You were there.

Defendant: I was at the house there, in the house, we were drinking tequila… <u>Are you my attorney or what?  Are you the one who is going to be my attorney?</u>

SA Holden: Well…

Defendant: Well, here I don't want to talk to the other one either.

SA Holden: Well, you have that right.

Defendant: <u>Yes, I have the right to talk to attorney of this problem, I don't have to talk to you.</u>

SA Holden: Okay. Look, here is a form…

Defendant: Yeah.

SA Holden: Of your rights, your rights.

(Def. Ex. A, 1) (emphasis added).

    Defendant then stated that he had been told that he had an attorney. (<u>Id.</u>). After Defendant told SA Holden that he could not read, SA Holden read Defendant the <u>Miranda</u> warnings from a Spanish version of an FBI Advice of Rights Form. (<u>Id.</u> at 1-2; <u>see also</u> Govt. Ex. 1). After SA Holden read Defendant the <u>Miranda</u> warnings, the following exchange occurred:

SA Holden: Well, you now have the, the decision, you can talk to us of what happened, about what happened or you can talk to an attorney.

Defendant: <u>No, I better talk to an attorney.</u>

4

SA Holden:     You want to talk to an attorney?

Defendant:     With attorney.

SA Holden:     [to SA Tjernagel] *He wants to talk to an attorney, alright?*

[to Defendant] Errr Bueno.[4]

[to SA Tjernagel] *Anything else before we go?*

SA Tjernagel: [to SA Holden] *Nothing else.*

SA Holden:     [to Defendant] Okay. We'll errr, call you an attorney for you to meet with him in private and after that you two will decide if you two want to talk to us, yes or no.

Defendant:     Okay.

SA Holden:     You understand me?

Defendant:     Yeah.

SA Holden:     Okay.

Defendant:     No, I can't, I have to talk to my attorney, I can't talk to the whole world about this, no!

SA Holden:     Sorry?

Defendant:     That I have to talk to my attorney.

SA Holden:     Uhum.

Defendant:     He will give me the orders. He says. The attorney.

SA Holden:     Okay.

Defendant:     So.

(Def. Ex. A. at 2-3) (emphasis added).

    SA Holden, believing the interview to be over, turned off the recording.

---

[4] No English translation of this statement was provided to the Court.

5

Between two and five minutes later, the Agents began recording the interview again. During the intervening unrecorded period, SA Tjernagel and SA Holden began to pick up their belongings. SA Tjernagel then got the attention of a Deputy Marshal to unlock the door to the interview room to allow the Agents and Defendant out. SA Holden told Defendant that it would be Defendant's last chance to share his side of the story with the Agents and that, if Defendant wanted to invoke his right to an attorney, the Agents were going to end the interview and leave. In response to this communication by SA Holden, Defendant ultimately began speaking with the Agents again without an attorney present.

The Agents then began making a second recording. SA Holden again reviewed the Miranda warnings with Defendant using the Spanish version of an FBI Advice of Rights Form, going through the form line by line. (Govt. Ex. 1). To SA Holden, Defendant appeared to understand the Miranda rights as SA Holden was explaining them to him. Defendant then signed the Spanish language FBI Advice of Rights Form. (Govt. Ex. 1). The English translation of the line that appears above Defendant's signature on the form states "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."[5]

After Defendant signed the advice of rights form, the Agents began questioning Defendant. The questioning lasted approximately an additional twenty-eight minutes.

## II.    DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, [Docket No. 49]

Defendant moves the Court to suppress any and all statements that he made to law enforcement during the September 22, 2015, interview.

---

[5] The Court notes, however, that the Agents had previously been told by Defendant that he could not read.

### A. Standard of Review

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. 5. To counteract the coercive pressure of custodial police interrogations, "Miranda announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." Maryland v. Shatzer, 559 U.S. 98, 103-04 (2010) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). "[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda, 384 U.S. at 444). Accordingly, interrogating officers are required to provide Miranda for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. In addition, "if the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. (Emphasis added). "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (emphasis added). See also Minnick v. Mississippi, 498 U.S. 146, 153 (1990) ("In our view, a fair reading

of Edwards and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning.").

**B. Analysis**

Defendant made statements during two distinct segments of the interview: (1) before SA Holden initially read Defendant the Miranda warnings; and, (2) after SA Holden initially read him the Miranda warnings.

1. Statements Made Before Initial Reading of the *Miranda* Warnings

Before SA Holden read Defendant the Miranda warnings the first time, he asked Defendant various questions seeking to elicit information regarding why the Agents were talking to Defendant, the name of the alleged victim, and Defendant's version of the events that led to the indictment. It is undisputed that Defendant was in custody when SA Holden asked him those initial questions, and given the investigation related nature of those initial questions, SA Holden's questions constituted interrogation. On the present record, it is also undisputed that Defendant had not yet been provided the Miranda warnings before responding to SA Holden's initial questions. "Officers must inform suspects of their Miranda rights before subjecting them to custodial interrogations." United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (emphasis added). "Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." Id. (citing United States v. Vanover, 630 F.3d 1108, 1114 (8th Cir. 2011)).

Accordingly, the Court recommends **GRANTING** Defendant's Motion to Suppress Statements, [Docket No. 49], to the extent Defendant seeks to suppress any statement that he made before SA Holden initially read Defendant the Miranda warnings.

2. <u>Statements Made After Initial Reading of the *Miranda* Warnings</u>

Defendant also moves the Court to suppress any statements he made after he invoked his right to counsel. As both the testimony of SA Holden and the translated transcript of the first recording of the interview indicate, Defendant unequivocally invoked his right to counsel immediately after SA Holden read him the initial <u>Miranda</u> warnings. The Agents at that time, admittedly understanding that Defendant had invoked his right to counsel, ceased questioning Defendant, and ended the interview by stopping the recording.

However, based on SA Holden's testimony during the motions hearing, he re-engaged Defendant in conversation before leaving the interview room by telling Defendant that it was his last chance to talk to the Agents, because if he wanted an attorney, the Agents were going to leave.  Shortly afterwards, Defendant apparently began to speak to the officers again, and the Agents, after reading Defendant the <u>Miranda</u> warnings a second time, resumed questioning him in a second recorded statement. The Agents did <u>not</u> provide Defendant with an attorney before they resumed questioning Defendant.

Accordingly, the question now before the Court is whether the Agents lawfully obtained Defendant's responses when they resumed questioning him after Defendant had clearly invoked his right to have counsel present during custodial interrogation.

As noted above, once an accused who is subject to custodial interrogation requests to have an attorney present during questioning, law enforcement <u>must</u> provide the accused with an attorney <u>before</u> questioning may resume. <u>Edwards</u>, 451 U.S. at 484-485.  In cases where counsel was not provided to the accused before law enforcement resumed questioning, a court may allow the accused's responses to further questioning into evidence "only on finding that [Defendant] (a) initiated further discussions with the police, <u>and</u> (b) knowingly and intelligently waived the

right he had invoked. Smith v. Illinois, 469 U.S. 91, 95 (1984) (citing Edwards, 451 U.S., at 485, 486, n. 9) (emphasis added).

The Government argues that SA Holden read Defendant the Miranda warnings twice, that the Agents did not engage in any coercive tactics, and that Defendant, therefore, knowingly and intelligently waived his right to counsel.

The Government's position reverses the order of the analysis required by Edwards, *supra*, and Smith, *supra*. Defendant here unequivocally invoked his right to counsel.  The initial inquiry is not whether Defendant knowingly and intelligently waived his right to counsel after the second reading of the Miranda warning by SA Holden, but rather, since it is undisputed that Defendant had invoked his right to counsel earlier and the Agents terminated the interview because of it, in the case now before the Court, it must initially be determined whether it was Defendant or the Agents who reinitiated conversation about the case investigation.

Not all discussion that follows an accused's invocation of the right to counsel will be a re-initiation of interrogation.  When an accused's invocation of the right to counsel is equivocal or unclear, law enforcement may ask non-coercive questions to clarify whether the accused has indeed requested the presence of counsel. Davis v. United States, 512 U.S. 452, 461 (1994).  In addition, questions by the accused or the officer that relate to the "routine incidents of the custodial relationship," typically will not suffice to initiate further communication for the purposes of the Edwards rule. Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983). Rather, "[i]nitiation by a defendant occurs when the defendant evinces 'a willingness and a desire for a generalized discussion about the investigation.'" Holman v. Kemna, 212 F.3d 413, 417 (8th Cir. 2000) (quoting Bradshaw, 462 U.S. at 1045-46).

Defendant's invocation of the right to have counsel present in this case was not equivocal. On the record presently before the Court, it is clear that both Agents clearly understood that Defendant had invoked the right to counsel. SA Holden, the Government's own Spanish speaking witness, told SA Tjernagel (the non-Spanish speaking agent) that Defendant had asked to speak to counsel. The Agents then terminated the interview by turning off their recorder and began packing their things while SA Tjernagel contacted a Deputy Marshal to unlock the interview room. This record plainly evidences the Agents' understanding that Defendant did not want to speak with them without counsel present. It is in this context that SA Holden then testified that he, not the Defendant, reinitiated conversation during the two to five minutes between the recorded interviews when he told Defendant that this would be Defendant's last chance to talk to the Agents. Accordingly, this is not a situation in which SA Holden's statement could be seen as simply trying to clarify whether Defendant had or had not sought to invoke the right to counsel. Nor did SA Holden's statement concern the routine incidents of the custodial relationship. Rather, SA Holden's statement on its face was plainly encouraging Defendant to submit to a generalized discussion about the investigation, that is to say, it was an effort by law enforcement to convince Defendant to again submit to interrogation without an attorney present as Defendant had unequivocally requested. This is precisely the type of behavior that the Edwards rule was created to deter. See Montejo v. Louisiana, 556 U.S. 778, 787 (2009) (noting that the Edwards rule was designed to prevent police from "badgering a defendant into waiving his previously asserted Miranda rights").

Because SA Holden, and not Defendant, reinitiated conversation about the investigation following Defendant's invocation of his right to counsel, the Court will and must presume that Defendant's statements in the second recording were made involuntarily, and the Government

cannot show that Defendant waived his right to counsel merely by showing that Defendant was read a second Miranda rights warning and signed the advice of rights form indicating that he was then willing to speak to the Agents without counsel present. McNeil v. Wisconsin, 501 U.S. 171, 177 (1991) ("If the police do subsequently initiate an encounter in the absence of counsel . . . , the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.").

Accordingly, the Court concludes that the failure of the Agents to provide Defendant with the requested counsel rendered all of the Defendant's subsequent statements inadmissible. In light of the foregoing, the Court recommends **GRANTING** Defendant's Motion to Suppress Statements, [Docket No. 49]).

### III.  CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements, [Docket No. 49], be **GRANTED** as set forth above.

Dated: December 7, 2015.                                  s/Leo I. Brisbois
                                                          Leo I. Brisbois
                                                          U.S. MAGISTRATE JUDGE


**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.